Dr. Julius J. LARRY, III, DDS, and
Dr. Abdul–Hakim Ahmed, DDS,
Plaintiffs–Appellants,

v.

Mark WHITE, Individually and in His Capacity, et al., Defendants–Appellees.

No. 89–2969.

United States Court of Appeals,
Fifth Circuit.

April 24, 1991.

---

Julius J. Larry, III, Houston, Tex., pro se.

Carnegie H. Mims, Jr., Jefferson & Mims, Houston, Tex., for Dr. Abdul–Hakim Ahmed.

Abdul–Hakim Ahmed, DDS, J.D., Houston, Tex., for amicus-Gulf State Dental Asso. of Texas, Inc.

Joseph W. Barbisch, Austin, Tex., Elena DiIorio, Vinson & Elkins, Houston, Tex., for Mark White.

Before CLARK, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs-appellants Dr. Julius J. Larry, III (Dr. Larry) and Dr. Abdul–Hakim Ahmed (Dr. Ahmed) appeal the district court's summary judgment dismissal of their suit against defendants-appellees Mark White, et al (appellees). We affirm.

### Facts and Proceeding Below

Dr. Larry, black and a graduate of Meharry School of Dentistry in Nashville, Tennessee, who practiced dentistry in the United States Army for six years, completed and failed the Texas dental licensing examination twice, once in August 1983 and again in June 1984. The examination consists of three parts that are taken over the course of three and one-half days: a section on dentistry and the law, a denture set-up section, and an oral diagnosis and treatment plan section. During the last section of the August 1983 examination, five members of the Texas State Board of Dental Examiners (Board) failed Dr. Larry while he was preparing a filling, purportedly because he was about to lay a base over decay that he had failed to remove from his patient's tooth.[1] Larry contends that he

---

1. It appears that five dental board members must agree to fail someone on this section of the examination. However, that number is not needed to fail someone for not meeting an examination time deadline. It is not clear from the record whether more than one Board member must vote to fail someone for not meeting a deadline.

had requested a "deep check" from the examiners, but was not given one.[2] Appellees deny that Dr. Larry failed because he had not obtained a "deep check" prior to a pulpal exposure and maintain that he failed only because of his error in preparing to lay a base over decay as reflected in the Board records.[3]

Dr. Larry repeated the dental licensing examination in June 1984 and again failed. He asserts that at 8:40 a.m. on the morning of the final part of the examination, examiners requested to see the completed bridge he was to have prepared. Dr. Larry maintains that because the examination was not supposed to end until noon, he had nothing to show the examiners. He asserts that as a result, Board members and appellees, Brian Babin (Babin) and L. Jack Bolton (Bolton), harassed him for twenty to thirty minutes by shouting at him. Dr. Larry claims that the reason given for his failure was that he did not have his bridge ready for the 10:00 a.m. pre-cementation check. Appellees maintain that Dr. Larry failed this portion of the examination because he did not complete his dental bridge by the termination of the examination at noon.[4]

Dr. Ahmed, also black, is a graduate of the University of Texas Dental Branch at Houston who first completed the dental licensing examination in June 1984. He claims that he requested and received a "deep check" in the final part of the examination when he feared nerve exposure, but that five examiners concurred in failing

him when nerve exposure subsequently occurred. According to Dr. Ahmed, the examiners asserted that Dr. Ahmed had failed because he had "proceeded on unnecessarily and mechanically exposed the tooth." Appellees maintain in their brief that Dr. Ahmed failed because he had "cut through good tooth in creating the exposure." Dr. Ahmed voluntarily withdrew from the final part of the September 1984 examination when his bridge would not properly fit the patient's mouth at the 10:00 a.m. pre-cementation check, even though, according to Dr. Ahmed, it had previously fit properly. Dr. Ahmed subsequently argued before the Board in a December 1984 hearing granted at his request that the misfit occurred because the patient suffered from a rare gum disease, Crohn's Disease, which caused two teeth to shift.[5] He claimed that just two days after the end of the examination the bridge in question was seated in the same patient's mouth by a licensed dentist. The Board unanimously rejected Dr. Ahmed's contention because it claimed it should not make an exception to its rules and pass Dr. Ahmed even though, according to Dr. Ahmed, the Board had in the past made exceptions for white examinees. Dr. Ahmed was offered, but refused, the opportunity to take the next examination.[6]

Dr. Larry filed a complaint in Texas state court on June 20, 1984, against Babin, Bolton, and the Texas State Board of Dentistry, contending that defendants denied

2. The "deep check" is a procedure, unwritten in the examination manual but orally explained to examinees prior to the examination, that permits examinees to avoid what could otherwise constitute grounds for failure when the nerve or pulpal cavity may be exposed in the course of the examination. To invoke the procedure, the examinee requests that the examiner take note of the possibility of such exposure, thus permitting the examinee to continue the examination if exposure subsequently occurs. Deposition testimony reflected that the "deep check" will not prevent failure if the subsequent exposure was "careless" or "wasn't necessary." Appellants stated below that they "do not quarrel with defendants' testimony in this regard."

3. Dr. Larry asserts in this regard that the appellees also failed him for leaving, in addition to the decay, "loose enamel rods" on the tooth over

which he was about to lay a base. Dr. Larry maintains that such rods cannot be seen with the naked eye, the insinuation being that it is not the true reason for his failure.

4. Dr. Larry also asserted in his complaint that the examiners had accused him of stealing another examinee's gold bridge and that Bolton and Babin followed him everywhere that morning "in hot pursuit."

5. Dr. Ahmed said he knew before the examination that the patient had Crohn's disease, but apparently did not believe it could cause this problem.

6. As of the summary judgment hearing, Drs. Larry and Ahmed each remained, and had remained, eligible to retake the licensing examination.

him his equal protection and due process rights under the Fourteenth Amendment of the United States Constitution. Dr. Larry amended the complaint three times, adding defendants and additionally alleging slander and intentional infliction of emotional distress. The state court dismissed the suit in December 1985 for want of jurisdiction on sovereign immunity grounds. Dr. Larry subsequently withdrew his notice of appeal.

On April 2, 1985, Dr. Larry filed the present suit against eighteen people, including then-Texas Governor Mark White, and various members of the Board as well as two of its attorneys, all in their individual and official capacities. The complaint sought relief under 42 U.S.C. §§ 1981, 1983 and 1985, alleging that defendants had engaged in "racially biased and discriminatory practices, under color of state law." Dr. Ahmed filed his suit on April 3, 1986, against virtually the same defendants as those named in Dr. Larry's complaint with the addition of the Texas State Board of Dentistry and the University of Texas Dental Branch at Houston. He sought relief as well under 42 U.S.C. §§ 1981, 1983, and 1985, alleging that defendants conspired against him based on his race, color, religion, and skin complexion, thus depriving him of his civil rights under color of state law. The cases were consolidated on November 20, 1986. The district court granted appellees' summary judgment motion on August 1, 1989, stating that Dr. Larry and Dr. Ahmed had failed to demonstrate that the Board had acted with a racially preju-

dicial animus. Dr. Larry and Dr. Ahmed each filed timely notice of appeal.

## Discussion

Appellants contend on appeal that the district court erred in granting appellees' summary judgment motion, asserting that a genuine issue of material fact exists regarding whether appellees failed them on their respective dental licensing examinations because of their race.[7] To demonstrate that a challenged official act violates the racial component of the equal protection clause of the Fourteenth Amendment, a party must prove the racially discriminatory purpose of the act. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 2047–50, 48 L.Ed.2d 597 (1976). The district court dismissed the case because appellants did not show that the challenged conduct was based on a "racial animus."[8]

As indicating racial discrimination, Dr. Larry presents statistics showing that graduates of two assertedly "predominantly" black dental schools, Howard and Meharry, historically do not fare as well on the Texas dental licensing examination as do graduates of Baylor University and the University of Texas dental schools, which are assertedly "predominantly" white.[9] Dr. Ahmed presented, following the summary judgment hearing, an unsworn letter from a statistician he retained stating that, based entirely on the assumed fact that of the twenty-four examinees who received a "deep check" at the June 1984 examination, the sole one to fail that examination was

---

**7.** Appellants' only claim here is one of racial discrimination. Appellants have made no substantive or procedural due process arguments. Their consolidated action is not a class action.

We note in passing that appellees' motion for summary judgment below was styled a "motion for partial summary judgment," apparently because it did not seek dismissal of Dr. Ahmed's "pendent state claims" (it *did* seek dismissal of all of Dr. Larry's claims; and its prayer requested that the court "dismiss plaintiffs' claims with prejudice"). On appeal Dr. Ahmed does not predicate any claim of error on the "partial" nature of the motion, and his only complaint (apart from the denial of Rule 11 sanctions) relates to the district court's ruling on his claim of racial discrimination, a matter that was clearly addressed in the summary judgment motion.

**8.** Dr. Larry asserts that "it is not necessary to prove discriminatory intent in a disparate impact" case, citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). However, the disparate impact theory and the *Watson* decision pertain to Title VII cases and are therefore inapposite here. *See Davis*, 96 S.Ct. at 2051–52.

**9.** Dr. Larry asserts on brief that the 1983 and 1984 passing percentages were as follows: University of Texas (90%, 87%), Baylor (91%, 86%), Meharry (25%, 20%), Howard (15%, 42%). The numbers and races of the examinees are not reflected in this presentation. Nor is the actual racial composition of any of these dental schools shown in the record.

the only black among the twenty-four, racial discrimination probably existed in application of the deep check rule at that examination.

Dr. Larry's skimpy and partial statistics do not further his claim of racial discrimination because they might reasonably lead to inferences other than racial animus by the Board. Because Meharry and Howard are located outside of Texas and the University of Texas and Baylor are in Texas, one could conclude from Dr. Larry's data that out-of-state students have fared less well historically on the Texas dental licensing examination than have in-state students. Indeed, the summary judgment evidence showed that out-of-state students generally had a much higher failure rate than in-state students. There was no showing that in any way correlated the higher out-of-state failure rate to race. Further, one might infer from Dr. Larry's statistics that the reason for the disparity in examination results is that Meharry and Howard are less academically rigorous than Baylor and the University of Texas.[10] The statistics do not separately reflect the pass rates on the dental licensing examination for black and white students at these schools (nor even the actual racial composition of the respective dental school student bodies or of their examinees). However, the undisputed evidence does show that all in-state blacks who took the examinations with Dr. Larry and Dr. Ahmed passed either those or subsequent examinations and were licensed to practice in Texas. The evidence also shows that a greater number of students failed the examinations taken by Dr. Larry and Dr. Ahmed than is normally the case. Statistics presented by appellees below in support of their motion for summary judgment reflect that in the nine examinations given from May 1983–85, at which there were over 1,100 examinees in all, the failure rate ranged from six to nine percent for six of the examinations; but

for the August 1983, June 1984, and September 1984 examinations, the failure rate was 43, 21, and 23 percent, respectively. We conclude that Dr. Larry's statistics do not demonstrate either a discriminatory effect or a discriminatory purpose of the challenged acts.[11] The letter from Dr. Ahmed's statistician was not presented to the district court in affidavit or other verified form, and appellants are not entitled to have it considered in ruling on the summary judgment motion. *See* Fed.R.Civ.P. 56(c). Moreover, we are unwilling to hold that a *prima facie* case of intentional racial discrimination is made out by no more of a showing than that of the twenty-four examinees who had a "deep check" on the June 1984 examination the only one to fail was the sole black among the twenty-four, particularly as the letter gives no indication of consideration of any other variables or of the particular facts involved, or of anything other than the mentioned numbers, or any explanation of why such consideration would not be necessary to a meaningful conclusion.

Appellants also note the cases of two white examinees who passed the June 1984 examination as evidence of racial discrimination. One examinee received a dental license even though he had not finished the examination. When the Board learned of its error, it procured surrender of the license. The other examinee was permitted to complete the examination a few days following the end of the examination period at which his patient swallowed a bridge. Although one might question the judgment of the Board in these instances, nothing Dr. Larry and Dr. Ahmed point to indicates that the Board's actions were at all racially motivated. *Cf. Richardson v. McFadden,* 563 F.2d 1130 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978) (mistakes of bar examiners in indi-

---

10. There was no summary judgment evidence respecting the quality or rigor of the programs at any of the four named institutions, or how their graduates fared on licensing examinations in other states, or the like.

11. We observe that, as Dr. Larry conceded at oral argument, much of the statistical data in his brief was actually not before the district court. Dr. Larry's brief does not indicate where in the record his statistical information may be found.

vidual cases do not necessarily amount to denial of equal protection).

Dr. Ahmed also asserts that six white examinees who experienced pulpal exposure without first getting a "deep check" passed. Dr. Ahmed avers that Dr. Paulette Arana (Arana) had told him that she and other white examinees passed the examination even though they had experienced pulpal exposure and had not received "deep checks." However, in Dr. Ahmed's affidavit relating a phone conversation he had had with Dr. Arana, Dr. Ahmed asserts that she stated she had received a "deep check." Three of the six white examinees mentioned by Dr. Ahmed, including Dr. Arana, averred in affidavits filed below that they had in fact received deep checks. We have found no contrary summary judgment evidence. Dr. Ahmed has not demonstrated by any competent summary judgment evidence any racial motivation on the part of appellees with regard to their "deep check" policy.[12]

Neither Dr. Larry nor Dr. Ahmed presented the district court with direct evidence of racial discrimination. Their experiences during the examinations do not demonstrate racially discriminatory intent on the part of appellees. The record indicates that Dr. Larry failed in August 1983 because he was about to lay a base over decay and loose enamel rods he had left on a tooth. His reference to the "deep check" procedure seems inapposite since that procedure relates only to cases of nerve or pulpal exposure. Further, whether Dr. Larry failed the examination in his second attempt because he missed the precementation check[13], as he suggests, or the noon deadline, as appellees contend, there is no evidence that the Board's decision to fail him was racially motivated. Taking his claim of harassment as true, Dr. Larry has not shown that the harassment was racially motivated or alleged that Babin or Bolton displayed any racial hostility toward him.[14]

Dr. Ahmed failed the June 1984 examination, after, according to him, having received a "deep check," when he cut through good tooth and exposed a nerve. However, because the "deep check" procedure does not ensure a passing grade if the exposure was unnecessary, which the Board members concluded was the case here, the Board's action is not shown to have been racially motivated. Dr. Ahmed withdrew voluntarily from the September 1984 examination, and he has not presented any evidence suggesting that the Board was under an obligation to later pass him on that never completed examination even if he felt he had a good reason for withdrawing.[15] He declined to take any subsequent examination.

---

**12.** Dr. Ahmed asserts in his brief that appellees have stated that they do not believe African–Americans are entitled to a deep check. He cites us to no summary judgment evidence of this, however, and we have found none. Dr. Ahmed also states that none of the four white examinees who received a deep check but experienced pulpal exposure failed. Again, he does not direct us to any supporting summary judgment evidence in the record, and we have found none.

Further, the summary judgment evidence reflects that pulpal exposure in the absence of a prior deep check was not intended to be an invariable or automatic cause of failure, and that failure on this basis would not be appropriate where, due to unusual circumstances, the exposure could not have reasonably been foreseen. Dr. Ahmed claims that a purported rule or practice of "automatic" failure was stated by certain Board members in their depositions, and was announced by one Board member at an examination. We are not cited to any place in the record where such depositions appear, nor to any summary judgment evidence of the announcement, and we have found none of either in the record. Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence. Depositions that are not included in the record (or were not filed below) are not to be considered.

**13.** Even if this rule is not written, as appellants assert, it is undisputed that the examinees were all orally informed of its existence before the examination.

**14.** The evidence indicates that Babin and Bolton thought Dr. Larry had taken the bridge of another examinee, whose bridge the undisputed evidence showed had mysteriously disappeared.

**15.** Dr. Ahmed, in his December 1984 hearing before the Board, requested that he be passed on the September 1984 examination, notwithstanding that he withdrew from it voluntarily when he was unable to fit the bridge, because two days after the examination ended a Houston dentist had fitted the bridge. Dr. Ahmed

Dr. Ahmed's final argument on appeal is that the district court abused its discretion by not granting appellants Rule 11 sanctions. Appellants had sought such sanctions for appellees' conduct in including *res judicata* and qualified immunity defenses in their motion for summary judgment. Dr. Ahmed contends that appellees had previously received adverse rulings on such defenses from the judges who handled the cases prior to their being consolidated before Judge Hughes, and that appellees therefore should not have been re-urging the defenses. Dr. Ahmed asserts that Judge Hughes denied the Rule 11 motion because of the age of the case without making any findings or conclusions.

The *res judicata* defense was asserted below only as to Dr. Larry since he alone brought the relevant state suit, and Dr. Larry has not raised the Rule 11 issue in his brief on appeal.[16] Therefore, we consider Dr. Ahmed's Rule 11 argument only with respect to the qualified immunity assertion. In an August 27, 1986 pretrial order, the district court ruled that discovery on the qualified immunity issue should continue "until the immunity issue is resolved." The discovery period formally ended on December 31, 1987, and appellees filed their motion for summary judgment, which included the qualified immunity defense, on March 14, 1988. Nothing Dr. Ahmed has presented this Court indicates that the district court had in any way ruled on the defense until after this filing. The district court did not abuse its discretion in denying the request for the Rule 11 sanctions.

## Conclusion

For the foregoing reasons, the district court's judgement is

AFFIRMED.

---

said the patient had had Crohn's disease, which he said he knew at the time but was unaware that it could affect the mouth. The bridge was made from an impression Dr. Ahmed had previously made of the patient as part of the examination. Dr. Ahmed advised the Board of the following "hypothesis" of why he had been unable to fit the bridge, namely because Crohn's disease had caused "an unexpected shift of the second and third molars." Dr. Ahmed stated:

> "Based on the information I received from these personal conversations [with certain dentists or doctors] and information gleaned from the literature reviewed, the following hypothesis is put forth: an unexpected shift of both the second and third molars of the lower right quadrant as a result of an acute inflammatory reaction caused by the dental surgical procedure and the retraction cord with its associated chemical agent."

Nothing appears in the record or was submitted from any of the dentists or doctors whom Dr. Ahmed said reviewed his "hypothesis" and found it reasonable. The dentist who had later seated the bridge submitted a letter stating that he had done so, but not commenting on the "hypothesis," any present or past "shifting" (or movement) of teeth, or Crohn's disease. The medical literature Dr. Ahmed submitted does make general references to the fact that Crohn's disease may adversely affect the mouth or cause "oral lesions"; nothing in it refers to any "unexpected shift" of the position of teeth or anything of that kind. Even Dr. Ahmed did not present his theory of what happened as anything more than a reconstructed "hypothesis" of what *may* have happened.

16. We observe that Dr. Larry's federal court suit might arguably have been precluded by the earlier state court judgment at least with regard to those parties who were defendants in both suits. We express no view as to federal suit defendants who were not also named in Dr. Larry's state court suit, although we note that complete identity of parties in the two suits is not always required. *See Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir.1989). Because Dr. Larry's federal claim arises out of the same operative facts as the state court suit and could have been litigated in the state court suit, the doctrine of *res judicata* might arguably apply. *See Flores v. Edinburg Consolidated Independent School District*, 741 F.2d 773 (5th Cir.1984). Although appellees did not raise the *res judicata* defense in their first pleading following the decision of the state court, we note that a court may, if it chooses, raise *res judicata sua sponte*. *See American Furniture Co. v. Int'l Accommodations Supply*, 721 F.2d 478, 482 (5th Cir.1981). Thus, in any event, it is difficult to see how a Rule 11 violation could be made out with respect to the assertion of *res judicata*.