MEMORANDUM AND OPINION
 

 ROSENTHAL, District Judge.
 

 Plaintiff, Anthony E. Patitu, alleges that his former employer, Nationsbank of Texas, discriminated against him on the basis
 
 *783
 
 of his race and national origin in terminating his employment. Patitu has sued under Title VII, 42 U.S.C. §§ 2000e to 2000e-17; 42 U.S.C. § 1981; section 5.01 of the Texas Commission on Human Rights Act (“TCHRA”), TEX. LABOR CODE ANN. § 21.051; and asserted state law claims for breach of his employment contract. Nationsbank has moved for summary judgment as to all Patitu’s claims. (Docket Entry No. 16).
 
 [1]
 
 Based on a careful review of the pleadings, the motion and response, the summary judgment record, and the applicable law, this court GRANTS Nationsbank’s motion for summary judgment, for the reasons set out in detail below.
 

 I. Background
 

 On March 24, 1997, Nationsbank hired Patitu, a black person of Tanzanian origin, as a Consumer Banker III at its South-wood Valley Banking Center in College Station, Texas. (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 37, 47). The Southwood Valley Banking Center had not yet opened.
 
 (Id.,
 
 Ex. 2, Buckner Aff., ¶ 4). Nations-bank planned to open the Center in August 1997 with one consumer banker on the premises. Nationsbank hired Patitu to fill that opening. Because Patitu would be the only consumer banker at that Center, the “sales success [of that center would] depend[] on his performance.”
 
 (Id.,
 
 ¶ 5; Ex. 1, Patitu Dep., p. 47).
 

 Janelle Bishop, a vice-president in the personnel department at Nationsbank, interviewed Patitu before he was hired. In the interview, Bishop told Patitu that the consumer banking position was “primarily a sales position, selling products and services of the bank, creating and developing new business for the bank, and also servicing the [existing] consumer base.” (Docket Entry No. 16, Ex. 1, Patitu Dep., p. 36). Bishop explained that the job required completion of “a formalized fulltime corporate training program which may last for six weeks, and it would involve going to Houston from time to time and spending time in College Station at the banking center to practice.”
 
 (Id.,
 
 pp. 36-37).
 

 Nationsbank’s training program consisted of three substantive “modules”: (1) consumer deposit and investment products; (2) consumer loans; and (3) real estate loans. Each training module in turn had three parts. The trainee first completed on-the-job training at the banking center. (Docket Entry No. 16, Ex. 6, Picazo Dep., p. 8). In the second part, each trainee took a “Systems” class, in which the trainee would master “the technical skills involved in inputting the new accounts or loans.”
 
 (Id.).
 
 The third part was the “Lab” class, in which the trainee would attain mastery of “communicating with the customer and [the] sales of.. .products.”
 
 (Id.).
 

 On March 24, 1997, Patitu participated in a job orientation by conference telephone call. Michelle Kennedy, a consumer banker trainer at Nationsbank, explained the structure of the training program and described Nationsbank’s expectations of trainees. In his deposition, Patitu testified that after his orientation, he understood that he was expected successfully to complete his training on May 23,1997 and that it was his responsibility to ensure that his training progressed as scheduled. (Docket Entry No. 16, Ex. 1, Patitu Dep., p. 74-76). Patitu understood that he had to complete the training successfully in order to be placed in a banking center as a Consumer Banker III.
 
 (Id.,
 
 p. 76).
 

 From March 24, 1997 to March 30, 1997, Patitu started the first part of the first training module, covering consumer depos
 
 *784
 
 it and investment products. Patitu did his on-the-job training at the Texas A & M Banking Center in College Station. Patitu trained under Brad Rushing, the A & M Banking Center manager. Rushing assigned Lisa Conner, senior consumer banker, and Ruth Easely, consumer banker, as Patitu’s training partners.
 
 (Id.,
 
 pp. 55-56; Ex. 7, Rushing Dep., pp. 14-15). Patitu did not train at the Southwood Valley Banking Center, where he expected to work, because that Center was not scheduled to open until August 1997.
 

 On March 31, 1997 and April 1, 1997, Patitu attended the second part of his first training module, the Systems class on consumer deposit and investment products, in Houston.
 
 (Id.,
 
 p. 62). Michelle Kennedy taught the class. After the first class on March 31, Kennedy told Patitu that he needed to “bring [his] typing skills up to standard.”
 
 (Id.,
 
 p. 84). Kennedy suggested that Patitu purchase a tutorial computer program to improve his typing skills.
 
 (Id.).
 
 From April 9, 1997 to April 11, 1997, Patitu attended the Lab part of the first training module in Houston. Michelle Kennedy also taught this class.
 
 (Id.,
 
 p. 63).
 

 On April 14, 1997, after teaching Patitu in the training modules dealing with the basic technical skills of handling and selling consumer banking products, Kennedy telephoned Rushing to express her concerns about Patitu’s performance. Kennedy reported that she had concerns about Patitu’s “speed and [his] not being able to use the [computer] system to do the tasks that were asked of him in the lab.” (Docket Entry No. 16, Ex. 7, Rushing Dep., pp. 28-29). Rushing conveyed Kennedy’s concerns to Patitu.
 
 (Id.,
 
 p. 28).
 

 On April 21, 1997 and April 22, 1997, Patitu attended the Systems part of the second training module, covering consumer loans, in Houston. Cindy Picazo, a trainer at Nationsbank, taught that class.
 
 (Id.,
 
 64; Ex. 6, Picazo Dep., pp. 5-6). During the first class, on April 21, Picazo told the class that the classroom was open before and after class to any trainee who wanted to practice their skills.
 
 (Id.,
 
 Ex. 1, Patitu Dep. pp. 89-90). After class on April 22, Picazo told Patitu and another employee, Jim McCallum, a Caucasian, that she did not think either of them were adequately prepared for the classroom exercises and that they both needed to improve their typing skills.
 
 (Id.,
 
 p. 88). Picazo told both Patitu and McCallum that they could use the training area in Houston before or after the scheduled classes and offered to prepare additional exercises for them, at their request.'
 
 (Id.,
 
 p. 91). Picazo told Patitu and McCallum that they could not attend the next training sessions until they displayed sufficient mastery of the skills covered in the Systems portion of second training module.
 
 (Id.,
 
 pp. 95-96). Patitu never attended the third part, the Lab portion, of the second training module and did not attend any of the third training module, which covered real estate loan products.
 
 (Id.,
 
 pp. 65-66).
 

 On April 23, 1997, Picazo discussed her concerns about Patitu’s performance with Janelle Bishop. (Docket Entry No. 16, Ex. 6, Picazo Dep., p. 52). Picazo told Bishop that Patitu “seemed unprepared for the classroom exercises, that he didn’t show familiarity with the screens [on the computer system] at all, that he was unable to apply the knowledge he learned in self-study to the systems exercise, [and] that his keyboarding skills were still slow.”
 
 (Id.).
 
 Picazo also shared these concerns with Rick Buckner, the regional manager in Austin, and with Rick Hajdik, the person hired to be the manager at the South-wood Valley Banking Center when it opened.
 
 (Id.,
 
 pp. 55-56).
 

 Patitu testified that when he returned to the A & M Banking Center after the April 22 Systems class, he told Rushing that Picazo had criticized his typing skills. Rushing asked Patitu what Rushing could do to help Patitu improve his skills. Pati-tu asked Rushing to allow Patitu to come to the banking center on Saturdays to
 
 *785
 
 work on his skills; Rushing agreed.
 
 (Id.,
 
 Ex. 1, Patitu Dep. pp. 105-06).
 

 On April 29, 1997, Picazo telephoned Rushing to discuss Patitu’s progress and reach a decision as to his readiness to attend the Lab class scheduled for April 30. Lisa Conner also joined the conversation. (Docket Entry No. 16, Ex. 6, Picazo Dep., pp. 38-39). Rushing and Conner told Picazo that
 

 [Patitu] had only inputted] one loan and that had been the day before, and that he had put on his first new account that week as well, and that he had problems inputting the new account, that it took him a very long time, that he had forgotten to order the ATM card [for the account], didn’t order the checks correctly for the account, that he could not find job aids that were specifically given to him during the first module of the training program to assist him with new account openings and conversions, and that it took him a very long time to be able to input the loan application on the system that he did.
 

 (Docket Entry No. 16, Ex. 6, Picazo Dep., p. 39). Picazo, Rushing, and Conner together decided that Patitu was not ready to attend the Lab training class scheduled for the next day.
 
 (Id.,
 
 Ex. 7, Rushing Dep., pp. 32-33; Ex. 6, Picazo Dep., p. 45). In his deposition, Patitu admitted that when he returned to the A & M Banking Center after the Systems class, he had trouble with certain transactions, forgot to order an ATM card that should have been included in opening the account, and entered an incorrect code in converting a customer’s market account to a savings account.
 
 (Id.,
 
 Ex. 1, Patitu Dep. pp. 121— 22).
 

 Patitu continued his on-the-job training at the A & M Banking Center. Rushing and Picazo regularly reported their assessments of Patitu’s performance and progress to Buckner and Bishop. (Docket Entry No. 16, Ex. 6, Picazo Dep., pp. 55-56; Ex. 7, Rushing Dep., pp. 55, 61-62; Ex. 2, Buckner Aff., ¶¶ 6-8). Based on the information from different sources that consistently found problems with Patitu’s performance in the training program, in early May 1997, Buckner decided to give Patitu a formal warning that if he did not improve, his ability to continue training and employment were at risk.
 
 (Id.,
 
 Ex. 2, Buckner Aff., ¶ 9). When Buckner made this decision, he had never met Patitu and did not know his race or national origin.
 
 (Id.).
 

 On May 5, 1997, Buckner and Hajdik traveled from Austin to College Station to meet with Patitu.
 
 (Id.,
 
 Ex. 2, Buckner Aff.,
 
 ¶
 
 10, Ex. 1, Patitu Dep., p. 132). Buckner and Hajdik asked Patitu about his progress and how he felt about his training.
 
 (Id.,
 
 Ex. 1, Patitu Dep., p. 132). Buckner told Patitu that he needed “to become proficient in deposit accounts and consumer loans offered at the Bank, perform all associated functions proficiently, and work at a quicker pace when opening accounts and loans on the computer and when performing customer service functions.”
 
 (Id.,
 
 Ex. 2, Buckner Aff., ¶ 11). Buckner clearly informed Patitu that “these expectations required him to greatly improve his keyboard skills.”
 
 (Id.).
 
 Patitu responded that he had purchased a computer tutorial and was looking into a typing course at a community college.
 
 (Id.,
 
 Ex. 1, Patitu Dep., pp. 132-33). Buckner and Hajdik told Patitu that he “was on the right track.”
 
 (Id.,
 
 p. 134). Buckner told Patitu that he might have to put in time outside of regular work hours to work on his training.
 
 (Id.,
 
 p. 136). Patitu responded that Rushing had allowed him to come in on Saturdays to work on his skills.
 
 (Id.).
 
 Buckner emphasized that Patitu had to improve his skills to continue training for the consumer banker position.
 
 (Id.,
 
 138; Ex. 2, Buckner Aff., ¶ 14). Buckner did not give Patitu the written formal warning notice during the May 5 meeting.
 

 On May 8, 1997, Patitu phoned Picazo to find out when he could attend the Lab part of the second training module.
 
 (Id.,
 
 Ex. 1, Patitu Dep., p. 146; Ex 6, Picazo Dep., p. 58). In the conversation, Picazo asked
 
 *786
 
 Patita how many loans he had entered in the previous two weeks; Patita explained that he had entered from five to seven loans.
 
 (Id.,
 
 Ex. 1, Patita Dep., p. 146). Picazo told Patita that he needed to enter at least one loan each day.
 
 (Id.,
 
 p. 147). Picazo asked Patita how many new accounts he had opened during the previous two weeks; Patita answered that he had opened eighteen new accounts.
 
 (Id.).
 
 Pi-cazo told Patita that this number was well below the average for a consumer banker and that he needed to open at least four accounts each day.
 
 (Id.;
 
 Ex. 6, Picazo Dep., p. 58-59). Picazo told Patita “to make sure [he] got in more work” by taking the initiative in his on-the-job training.
 
 (Id.,
 
 Ex. 1, Patita Dep., p. 148; Ex. 6, Picazo Dep., p. 59-60). She told Patita that he “need[ed] to improve [his] system input skills, [his speed in inputting information], [his] familiarity with the screens, and the only way [he was] going to get that is through practice.”
 
 (Id.,
 
 Ex. 6, Pica-zo Dep., p. 59). ,
 

 Later in May 1997, Buckner, Bishop, and Picazo again discussed Patitu’s performance. (Docket Entry No. 16, Ex. 2, Buckner Aff., ¶ 14). Buckner, Bishop, and Picazo concluded that at the A & M Banking Center, Patita was spending too much time in the back room working on his self-study materials and not enough time working with customers. They decided to move Patita to the Pflugerville Banking Center in Austin. In that location, which had no back room, Patita would spend more time dealing with customers. In addition, moving Patita to the Pflugerville center would also allow another banking manager to assess Patitu’s performance and determine whether he was ready to continue classroom training.
 

 From May 21, 1997 to May 23, 1997, Patita worked at the Pflugerville center. Stacy Harris, the Pflugerville banking center manager, reported several problems in Patitu’s performance to Buckner.
 
 (Id.,
 
 Ex. 9, Harris Memo.). Harris told Buckner that “Patita displayed inadequate keyboarding skills which caused him difficulty in all aspects of his job.”
 
 (Id.,
 
 Ex. 2, Buckner Aff., ¶ 14).
 

 In his affidavit, Buckner stated that based on “(i) the consistent feedback from Kennedy, Rushing, Picazo, and Harris, (ii) the Bank’s extension of Module I and Module II training for Patita by five weeks, (iii) Patitu’s continued poor performance, and (iv) the Bank’s need of a qualified and trained consumer banker at the Southwood Center by August 1997,” he and Bishop decided to test Patitu’s mastery of the skills covered in the training classes Patita had attended. (Docket Entry No. 16, Ex. 2, Buckner Aff., ¶ 15). On June 2, 1997, Buckner, Bishop, and Rushing held a conference call with Patita.
 
 (Id.,
 
 ¶ 16; Ex. 1, Patitu Dep., p. 128). They “discussed Patitu’s poor performance and the Bank’s expectations of a consumer banker trainee’s skills and knowledge with ten weeks of training.”
 
 (Id.,
 
 Ex. 2, Buckner Aff., If 16). Buckner told Patita that “he would be given an assessment test on June 4-6 to test his product knowledge and keyboard proficiency of the training materials covered in Module [sic] I and II.”
 
 (Id.).
 
 Rushing told Patita in advance the topics the test would cover.
 
 (Id.).
 
 Bishop told Patita that “his performance on the test would determine the Bank’s options regarding his training.”
 
 (Id.;
 
 Ex. 1, Patita Dep., pp. 165-66).
 

 Patita took the assessment test from June 4 to June 6, 1997. The test included a computer test Patita had taken twice before; Patita failed to achieve satisfactory performance on the test. The second part of the test required Patita to perform a variety of simple banking transactions; Patita could not complete several of the transactions. The third test component required Patita to input a loan application. Patita needed 37 minutes to complete the task; Nationsbank expects every consumer banker to input a loan application in ten minutes. Rushing reported Patitu’s test results to Buckner and Bishop. They concluded that Patita “failed to achieve
 
 *787
 
 satisfactory performance.”
 
 (Id.,
 
 Ex. 2, Buckner Aff., If 17). Buckner decided to terminate Patitu’s employment. (Docket Entry No. 16, Ex. 2, Buckner Aff., 1Í18). Bishop concurred in the decision.
 
 (Id).
 
 In his affidavit, Buckner stated that he based his decision on the following factors:
 

 (1) Patitu’s extended training, (2) the Bank’s numerous attempts to help him improve his performance, (3) Patitu’s failure to demonstrate mastery of the Bank’s products, information and materials in Module I and II, (4) his inadequate keyboarding skills, (5) his failure to achieve satisfactory performance on the June 1997 assessment tests, and (6) the Bank’s need for a qualified and trained consumer banker ready to begin work at the Southwood Center in August 1997.
 

 (Id.,
 
 ¶ 18).
 

 On June 9, 1997, Buckner and Rushing met with Patitu. (Docket Entry No. 16, Ex. 2, Buckner Aff., 1119). Buckner presented Patitu with a written “Formal Warning” memorandum that summarized the May 5, 1997 meeting between Patitu, Buckner, and Hajdik.
 
 (Id.,
 
 Ex. 1, Patitu Dep., p. 140). Buckner told Patitu that he had forgotten to give Patitu the memorandum at the May 5 meeting.
 
 (Id.).
 
 The memorandum bore a date of May 5, 1997.
 
 (Id.,
 
 Ex. 8). Buckner had signed the memorandum and put the date of June 9, 1997 next to his signature.
 
 (Id.).
 
 Hajdik also signed and wrote the date of June 9, 1997, noting that he had witnessed the meeting on May 5, 1997.
 
 (Id.).
 
 Patitu refused to sign the formal warning memorandum because he “did not agree with it.”
 
 (Id.;
 
 Ex. 1, Patitu Dep., pp. 139-40). Pati-tu’s disagreement was that the memorandum did not accurately reflect the topics discussed in the May 5 meeting. Patitu contended that the May 5 meeting focused on his keyboarding skills, while the memorandum contained broader criticisms of his work performance and training progress.
 
 (Id.,
 
 pp. 141-42).
 

 Patitu testified that Buckner told him that if he had signed the formal warning memorandum, Buckner would have given him a chance to stay and improve his work. However, because Patitu did not sign the document, Buckner pulled another document, a termination letter, from his briefcase and terminated Patitu’s employment.
 
 (Id.,
 
 pp. 183-84). Buckner contested this account, testifying that he had already made the decision to discharge Patitu before he traveled to College Station to inform Patitu of that decision.
 

 Patitu sued, alleging race and national origin discrimination and breach of his employment contract. (Docket Entry No. 10). Nationsbank moved for summary judgment, asserting that it discharged Pa-titu for legitimate, nondiscriminatory reasons. (Docket Entry No. 16). Nations-bank contends that Patitu’s breach of contract claim fails because he had no employment contract.
 

 The motion is considered below.
 

 II. Applicable Legal Standards
 

 A. The Summary Judgment Standard
 

 Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.
 
 See
 
 FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of “informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Norman v. Apache Corp.,
 
 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant’s case. See
 
 Little v. Liquid Air Corp.,
 
 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment
 
 *788
 
 must be denied, regardless of the nonmov-ant’s response.
 
 See id.
 

 When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.
 
 See McCollum Highlands, Ltd. v. Washington Capital Dus, Inc.,
 
 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.
 
 See Little,
 
 37 F.3d at 1075 (citing
 
 Celotex,
 
 477 U.S. at 325, 106 S.Ct. 2548).
 

 “[WJhen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is actually making two separate conclusions: ‘First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law.’ ”
 
 Lemoine v. New Horizons Ranch and Center, Inc.,
 
 174 F.3d 629, 633 (5th Cir.1999) (quoting
 
 Colston v. Barnhart,
 
 146 F.3d 282, 284 (5th Cir.),
 
 cert. denied,
 
 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998)).
 

 In deciding a summary judgment motion, “[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). “Rule 56
 
 ‘mandates
 
 the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.’ ”
 
 Little,
 
 37 F.3d at 1075 (quoting
 
 Celotex,
 
 477 U.S. at 322, 106 S.Ct. 2548).
 

 B. The Title VII Standard
 

 The elements of a claim of discrimination under Title VII, under section 1981, and under the TCHRA are identical.
 
 See Anderson v. Douglas & Lomason Co.,
 
 26 F.3d 1277, 1284 n. 7 (5th Cir.1994);
 
 Shackelford v. Deloitte & Touche, LLP,
 
 190 F.3d 398, 404 n. 2 (5th Cir.1999). In a case alleging intentional discrimination, a plaintiff relying on inferential or circumstantial evidence must demonstrate a
 
 prima facie
 
 case of discrimination. If successful, the burden then shifts to the defendant to show a legitimate and nondiseriminatory basis for the adverse employment decision. The plaintiff must then show that the defendant’s offered reason is pretextual and that race motivated the challenged employment decision.
 
 St. Mary’s Honor Center v. Hicks,
 
 509 U.S. 502, 507-508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993);
 
 Texas Dept. of Community Affairs v. Burdine,
 
 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A
 
 prima facie
 
 case is established once the plaintiff has proved that she (1) is a member of a protected class; (2) was qualified for her position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class.
 
 See Ward v. Bechtel Corp.,
 
 102 F.3d 199, 202 (5th Cir.1997). The
 
 prima facie
 
 case, once established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions.
 
 See Meinecke v. H & R Block,
 
 66 F.3d 77, 83 (5th Cir.1995) (citing
 
 Burdine,
 
 450 U.S. at 254, 101 S.Ct. 1089). If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are a pretext for discrimination. Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination.
 
 See Rhodes v. Guiberson Oil Tools,
 
 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case
 
 *789
 
 reaches the pretext stage, the sufficiency of the evidence test is applied).
 

 III. The Title VII Claim
 

 Patitu has shown that he is a member of a protected group and that he was subjected to an adverse employment action. Na-tionsbank has presented evidence of its legitimate, nondiscriminatory reasons for firing Patitu. Specifically, Nationsbank has submitted evidence showing that during the short period of his employment, Patitu received consistent criticisms of his keyboarding and other skills basic to the job for which he was hired. Nationsbank’s evidence shows that Patitu received such criticism from different trainers and supervisors. Nationsbank administered an assessment test to measure Patitu’s ability to perform these basic skills and decided to terminate his employment when he failed that test. Patitu can survive summary judgment on his Title VII claim only if the evidence in the record raises fact issues as to whether Nationsbank’s asserted reasons for his discharge were actually a pretext for race or national origin discrimination.
 

 In
 
 Mayberry v. Vought Aircraft, 55
 
 F.3d 1086 (5th Cir.1995), the plaintiff, fired because of poor performance, asserted evidence that his employer was
 
 wrong
 
 in finding fault with his performance as evidence of pretext and discrimination. The court found that the defendant had met its burden of articulating a legitimate, nondiscriminatory reason for the employment decision. In deciding whether plaintiff had raised a fact issue that the employer’s proffered reason was a pretext for unlawful discrimination, the Fifth Circuit noted that the plaintiff had essentially reasserted his prima facie case. The court noted that “[t]he material fact issue on whether [plaintiff] was at fault exist[ed] only because [defendant] admitted that, although it found no evidence of machine error, it could not be
 
 certain
 
 that some sort of machine malfunction did not occur. Nonetheless, in [defendant’s] judgment it was clear enough that [plaintiff] was partially at fault.”
 
 Id.
 
 at 1091 (footnote omitted). The court emphasized that “[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.”
 
 Id.
 

 [E'jven an incorrect belief that an employee’s performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee’s competence. Motive is the issue.... [A] dispute in the evidence concerning ... job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.
 
 [2]
 

 
 *790
 

 Id.
 
 (quoting
 
 Little,
 
 924 F.2d at 97) (alterations in original).
 

 Patitu points out that he was the only black person in his training class, the only Tanzanian in his class, and the only person in his class who spoke with an unusual accent. (Docket Entry No. 21, Ex. I, Defendant’s Answers to Interrogatories, Resp. No. 3; Ex. A, Patitu Aff., 118). Pati-tu also points out that during Rushing’s two years as manager of the A
 
 &
 
 M Banking Center, none of the consumer bankers assigned to that center was black, and only four of the employees were black.
 
 (Id.,
 
 Ex. D, Rushing Dep., pp. 13-14). The Fifth Circuit has held that such facts, without more, are not evidence of intentional racial discrimination.
 
 See Larry v. White,
 
 929 F.2d 206, 210 (5th Cir.1991).
 

 Patitu challenges one of the sources of Buckner’s information about Patitu’s problems in the training program. Cindy Pica-zo, who taught Patitu in the Systems portion of the first training module, criticized Patitu’s keyboarding skills' and class preparation to Buckner, Bishop, and Rushing, and participated in the April 29, 1997 decision that Patitu was not ready to proceed with his training. Patitu asserts that Pica-zo treated Patitu differently from the other students, because Picazo promptly assisted other students when they had a question, but ignored Patitu when he raised his hand. In his deposition, Patitu testified that, on one occasion, he snapped his fingers to attract Picazo’s attention after she had worked .with other students with questions rather than responding to him. Picazo became angry at Patitu and told him that he could not summon her as if she were a “dog.” (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 98-99; Docket Entry No. 21, Ex. A, Patitu Aff., H 11). Patitu also testified that Janelle Bishop told him that Picazo had criticized Patitu’s communication skills. (Docket Entry No. 16, Ex. 1, Patitu Dep., p. 117). Patitu claims that during the April 21, 1997 training session, Picazo told the class that “sometimes you have to listen real carefully because people are different.” As an example, Picazo said that it was hard to understand “oriental people.” (Docket Entry No. 1, Ex. 1, Patitu Dep., pp. 117-18). Patitu asserts that Picazo’s comment evidences her discriminatory attitudes against those with foreign accents.
 

 Patitu’s testimony as to how Picazo treated him in class does not evidence intentional discrimination. The undisputed record evidence shows that Picazo met with Patitu and encouraged him to improve his keyboarding skills by coming in early and staying late. It is undisputed that Picazo offered to develop additional exercises to help Patitu. (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 91-92). Patitu’s generalized and subjective complaint that Picazo did not respond to him in class as quickly as other trainees who also needed assistance is insufficient to raise a fact issue as to discrimination.
 
 See Swanson v. General Servs. Admin.,
 
 110 F.3d 1180, 1186 (5th Cir.1997).
 

 Patitu claims that Picazo’s statement about the necessity for bank employees to listen carefully to people with accents casts a discriminatory light on her statement to Bishop about Patitu’s communication skills. Although Picazo denied making such statements, this court views the evidence in the light most favorable to Patitu for the purpose of this motion. The statement Picazo allegedly made to Bishop about Patitu contained no reference to Patitu’s accent, but only to his communication skills. The Fifth Circuit has held that poor communication skills is a legitimate, nondiscriminatory basis for employment assessments.
 
 See Grimes v. Texas Dept. of Mental Health & Mental Retardation,
 
 102 F.3d 137, 143 (5th Cir.1996). Moreover, the record reflects that Picazo was
 
 *791
 
 only one of several managers and trainers who, after an extended period of training and evaluation, found Patitu’s mastery of the basic skills necessary for his job severely lacking. Patitu has not disputed much of this evidence.
 

 Patitu claims that the record shows that Picazo treated him less favorably than a similarly situated employee, Jim McCal-lum, who, like Patitu, had difficulty in the first part of the training program, but, unlike Patitu, was white and not foreign born. Patitu raises a claim of disparate discipline, asserting that Picazo did not hold McCallum back from continuing to take the training program and move to employment, but did hold Patitu back.
 

 The evidence is undisputed that Picazo spoke to both Patitu and McCallum about their poor keyboarding skills after the training class on April 22, 1997. (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 88, 92-96). She told both that they could not continue with their training unless their skills improved.
 
 (Id.,
 
 p. 88; Ex. 6, Picazo Dep., p. 28). However, Picazo allowed McCallum, but not Patitu, to proceed with his classroom training on April 30, 1997, as scheduled.
 

 Picazo testified that McCallum was allowed to proceed with his training because he responded to her warnings differently than Patitu. Picazo told both Patitu and McCallum that she would be available before and after class to help them improve their typing skills and that they could stay in the classroom during lunch to work on their typing.
 
 (Id.,
 
 p. 29). Picazo testified that “[Patitu] did not take any of those opportunities to practice on the system and [McCallum] did.”
 
 (Id.).
 
 Patitu disagreed, testifying that he came to class 15 or 20 minutes early and worked through lunch.
 
 (Id.,
 
 Ex. 1, Patitu Dep., p. 90). For the purpose of this motion, this court takes as true Patitu’s testimony as to the time he spent in addition to class to improve his skills. However, Patitu does not address the other, undisputed evidence as to McCallum’s efforts to improve his skills and the results of those efforts, compared to Patitu’s own work.
 

 On April 29, 1997, the day before the next scheduled training class, Picazo telephoned the banking centers where McCal-lum and Patitu worked to check their progress. The banking center manager supervising McCallum told Picazo that McCallum “had made a complete turn around from prior to the systems training.”
 
 (Id.,
 
 p. 29). The manager reported to Picazo that McCallum had been coming to work early and staying late to work on his skills so that he could spend his time during business hours “on the platform with the consumer bankers,” and “had asked each one of the consumer bankers to allow him to input any loans that came into the banking center ....”
 
 (Id.).
 
 In light of this information, Picazo decided to allow McCallum to attend the April 30 training class.
 

 By contrast, when Picazo telephoned the banking center where Patitu worked, Rushing and Conuer told Picazo that Pati-tu had “inputted” only one account and one loan application; that he had made errors; and that his work was slow. (Docket Entry No. 16, Ex. 6, Picazo Dep., p. 39). Picazo, Rushing, and Conner jointly decided that Patitu was not ready to attend the Lab training class scheduled for the next day.
 
 (Id.,
 
 Ex. 7, Rushing Dep., pp. 32-33; Ex. 6, Picazo Dep., p. 45).
 

 The record evidence shows that McCallum was not treated more favorable than Patitu “under ‘nearly identical’ circumstances.”
 
 Little v. Republic Refining Co.,
 
 924 F.2d 93, 96-97 (5th Cir.1991) (quoting
 
 Smith v. Wal-Mart Stores,
 
 891 F.2d 1177, 1180 (5th Cir.1990)). After Picazo told both McCallum and Patitu that their keyboarding skills were lacking, McCallum showed initiative, made every effort to practice “inputting” consumer product information, and improved his speed and accuracy. McCallum’s manager felt that he had made a “complete turn around.” Patitu’s efforts did not lead to
 
 *792
 
 similar success. Patitu continued to lack speed and accuracy in basic keyboarding. His manager and training partner felt that he was still not ready to proceed with his classroom training. The evidence as to McCallum does not raise a fact issue as to discrimination by Picazo that precludes summary judgment.
 

 Patitu also blames the on-the-job training component of the program for his lack of progress. Patitu claims that Rushing and Picazo offered little guidance about how to improve keyboarding skills. Patitu points out that, in Rushing’s nearly four years as a banking center manager, Patitu was the only consumer banker trainee under Rushing’s supervision who was discharged before the end of his training. The undisputed evidence in the summary judgment record does not support Patitu’s argument. The undisputed evidence shows that Picazo gave Patitu advice as to how to improve his keyboarding skills and offered to develop additional exercises to help Patitu; that Rushing asked Patitu several times how he could help Patitu with his training; and that Rushing accommodated Patitu when he asked for permission to come in on Saturdays for additional practice. (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 105-06, 130-31). In his deposition, Patitu testified that his training partners, Lisa Conner and Ruth Easely, were often helpful in his training.
 
 (Id.,
 
 p. 56). Patitu acknowledges that the training did not succeed in meeting his needs. However, there is no evidence linking the quality or quantity of the training Patitu received to discrimination based on Patitu’s race or national origin.
 

 Patitu argues that the June 1997 assessment test, given after several different trainers and supervisors had complained about his skills, did not provide a fair evaluation of his skills. Patitu testified that he had to take the test at a different computer terminal than the one he usually used and that during the test, he had problems with the computer terminal and was frequently interrupted by customers.. (Docket Entry No. 16, Ex. 1, Patitu Dep., pp. 171-72). Patitu attributed his slow speed in inputting information to these difficulties.
 
 (Id.,
 
 pp. 172-73). Patitu also testified that several questions on the test-were “out-of-date.”
 
 (Id.,
 
 pp. 173-74). However, Patitu’s assertions as to his problems in the test does not raise a fact issue that the test was such an unfair assessment of his skills that reliance upon it evidenced discrimination.
 
 Cf. Guthrie v. Tifco Indus.,
 
 941 F.2d 374, 378 (5th Cir. 1991).
 

 Buckner based his decision to terminate Patitu’s employment in part on Rushing’s report of Patitu’s performance on the assessment test. There is no evidence showing that the circumstances Patitu encountered made the test unreliable, particularly in light of the consistency between the test results and the earlier performance reports about Patitu from a number of independent sources within Nationsbank. There is no evidence that, had Rushing adjusted for the problems Patitu encountered in taking the assessment test, Rushing’s report to Buckner about the test would have been materially different. There is no evidence that any failure by Rushing to take Patitu’s complaints about the test circumstances into account in making the report to Buckner was motivated by discrimination based on Patitu’s race or national origin. The circumstances and results of the assessment test do not raise a fact issue whether Buckner’s stated reasons for discharging Patitu, Patitu’s failure to demonstrate mastery of the areas covered in the training program, was a pretext for unlawful discrimination.
 

 Finally, Patitu argues that the circumstances surrounding the written formal warning memorandum Buckner presented to Patitu on June 9, 1997 raise a fact issue as to whether the asserted reasons for Patitu’s discharge were, a pretext for discrimination. The written formal warning memorandum described the May 5, 1997 meeting between Buckner, Hajdik, and Pa-titu. However, Buckner did not give Pati-
 
 *793
 
 tu the memorandum at that meeting. Instead, Buckner presented Patitu with the memorandum on June 9, 1997. Patitu refused to sign the memorandum because he disagreed with its characterization of the May 5 meeting. Buckner then terminated Patitu’s employment.
 

 Patitu argues that the inaccuracy of the formal warning memorandum and Buckner’s failure to present it at the May 5 meeting cast doubt on the legitimacy of Nationsbank’s stated reasons for his discharge. However, there is no dispute that the May 5 meeting occurred. There is no dispute that during the May 5 meeting, Buckner and Hajdik told Patitu that he needed to improve his keyboarding skills in order to continue training for the consumer banker position. Buckner and Hajdik traveled from Austin to College Station specifically to meet with Patitu on May 5. Although Patitu disagreed with some aspects of the characterization of the May 5 meeting in the formal warning memorandum he received on June 9, Patitu admitted that after the May 5 meeting, Patitu knew that he needed to improve his skills or risk losing his job. The fact that Buckner did not give Patitu the written formal warning memorandum until June 9, 1997 does not raise a disputed fact issue as to pretext or discrimination.
 

 Patitu has produced no Nationsbank policy requiring the bank to give an employee a written formal warning notice a specified number of days before discharge. Even if there were evidence of such a policy, the Fifth Circuit has held that an employer’s failure to follow its own employment policies does not prove unlawful discrimination absent a showing that discrimination was a motive in the action taken.
 
 See Risher v. Aldridge, 889 F.2d 592,
 
 597-98 (5th Cir. 1989);
 
 Moore v. Eli Lilly & Co.,
 
 990 F.2d 812, 819 (5th Cir.1998). Patitu has made no such showing here.
 

 The combination of the issues Patitu raises does not generate a disputed question of fact that precludes summary judgment. To the contrary, the summary judgment record shows that from the beginning of Patitu’s training until his discharge, his trainers and supervisors consistently noted inadequate keyboarding skills and related performance problems. Patitu admitted many of the problems noted. Nationsbank gave Patitu an opportunity to improve his skills, with no significant positive results. Based on several critical reports he received about Patitu, Buckner met with Patitu on May 5, 1997, telling him that he could not continue with his training unless he improved his skills. Later in May, Nationsbank temporarily moved Patitu to a different banking center for training. The manager of that center reported problems with Patitu’s keyboarding skills and overall performance. Buckner decided to give Patitu an assessment test in early June, rather than rely only on the information he had already received. Rushing reported to Buckner about Pati-tu’s performance on the test; Buckner concluded that it was unsatisfactory. In light of Patitu’s persistent difficulties and Nationsbank’s need for a capable consumer banker to staff the Southwood Valley Banking Center upon its opening in August 1997, Buckner decided to terminate Patitu’s employment. Patitu has not submitted evidence showing that Buckner’s stated reasons for the decision were a pretext for discrimination based on Pati-tu’s race or national origin or showing that any of the critical reports about Patitu that Buckner received from Rushing, Picazo, or any other employee were motivated by discriminatory animus.
 

 IV. The Breach of Contract Claim
 

 Patitu alleges that Nationsbank “breached its verbal agreement to train” Patitu by “refus[ing] to allow him to complete the training program.” (Docket Entry No. 10, 1112). Nationsbank has moved for summary judgment, asserting that Patitu had no employment contract with Nationsbank and was an at-will employee. (Docket Entry No. 16). Patitu has not responded to
 
 *794
 
 the motion for summary judgment as to the breach of contract claim.
 

 “The long-standing rule in Texas provides for employment at will, terminable at any time by either party, with or without 'cause, absent an express agreement to the contrary.”
 
 Federal Express Corp. v. Dutschmann,
 
 846 S.W.2d 282, 283 (Tex.1993); see
 
 also Montgomery County Hosp. Dist. v. Brown,
 
 965 S.W.2d 501, 502 (Tex.1998). Patitu has not produced any written employment contract with Nations-bank. Patitu bases his contract claim on a March 6, 1997 letter offering him employment at Nationsbank. (Docket Entry No. 16, Ex. 3; Ex. 1, Patitu Dep., pp. 199-200). The letter states Patitu’s salary, his start date, and that Patitu might “be asked to relocate upon successful completion of his training.” The letter contains no promise to train Patitu. Texas courts have held that such letters do not overcome the presumption of at-will employment.
 
 See Rios v. Texas Commerce Bancshares, Inc.,
 
 930 S.W.2d 809, 815 (Tex.App. — Corpus Christi 1996, writ denied);
 
 Webber v. M.W. Kellogg Co.,
 
 720 S.W.2d 124, 128 (Tex. App. — Houston [14th Dist.] 1986, writ ref. n.r.e.).
 

 Patitu also asserts that Colleen Brown’s and Janelle Bishop’s oral statements to Patitu that Nationsbank was “hiring [Patitu] as a fulltime employee to go into a formalized training program with Nationsbank” created an employment contract. However, such general statements “simply do not justify the conclusion that the speaker intends by them to make a binding contract of employment.”
 
 Montgomery County,
 
 965 S.W.2d at 502. “For such a contract to exist, the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances.”
 
 Id.
 
 The summary judgment record discloses no unequivocal indication of Nationsbank’s intent to be bound to a promise to train Patitu. Patitu had no employment contract with Nationsbank. Nationsbank breached no contract by refusing to allow Patitu to complete his training.
 

 V. Conclusion
 

 This court GRANTS Nationsbank’s motion for summary judgment.
 

 [1]
 

 . Patitu has also moved to strike Nations-bank’s statement of uncontested facts in its motion for summary judgment, asserting that Nationsbank mischaracterizes the evidence in the record. (Docket Entry No. 22). This court bases its determination of a summary judgment motion on an independent review of the record evidence. Nationsbank’s statement of uncontested facts is not evidence, but rather a brief. This court treats it as such in deciding the motion for summary judgment. Patitu’s motion to strike is DENIED.
 

 [2]
 

 . Patitu has moved to strike portions of Buckner’s affidavit, including the portions in which Buckner explains the information he was provided by other Nationsbank employees and on which he relied in part in making decisions about Patitu’s employment. Buckner also explains his own conclusions about Patitu’s ability to perform the job for which he was hired. Patitu objects to statements in the affidavit as hearsay or as lay opinion testimony. (Docket Entry No. 23).
 

 Nationsbank responds that the statements to which Patitu objects on hearsay grounds are not offered for the truth of the matters asserted. (Docket Entry No. 24). Rather, Nationsbank offers those statements, either reports Buckner received about Patitu's performance or conversations Buckner had about Patitu's performance, as evidence of Buckner’s state of mind when he made the decision to terminate Patitu’s employment. The statements in his affidavit show the information Buckner received about Patitu and show the basis for his decision to discharge Patitu. They are not offered to show that the information received was true, or
 
 not true,
 
 but rather that Buckner had received the information when he decided to terminate Pati-tu.
 

 The statements Patitu challenges as improper lay opinion testimony are Buckner's conclusions about Patitu’s job performance. Pa-titu claims that Nationsbank has not shown that these conclusions were based on Buckner’s perceptions, as required by Rule 701 of the Federal Rules of Evidence. However, these statements are not offered to show that Buckner’s conclusions about Patitu's performance were correct or not correct, but rather
 
 *790
 
 to show what his conclusions were and the information on which he based them.
 

 Patitu’s objections are without merit. This court DENIES Patitu’s motion to strike portions of Buckner's affidavit.