**SOLO SERVE CORPORATION,**
Plaintiff–Appellant,

v.

**WESTOWNE ASSOCIATES,**
Defendant–Appellee.

No. 90–3051.

United States Court of Appeals,
Fifth Circuit.

April 18, 1991.

K. Eric Gisleson, Steeg & O'Connor, New Orleans, La., for Solo Serve Corp.

Thomas M. Benjamin, Patrick Johnson, Jr., Lemle, Kelleher & Kohlmeyer, New Orleans, La., for Westowne.

Before WISDOM, KING and BARKSDALE, Circuit Judges.

WISDOM, Circuit Judge:

This case raises two issues: (1) was the summary judgment evidence sufficient to create a genuine issue of fact; (2) if the evidence presented was insufficient, did the district court abuse its discretion in refusing to give the plaintiff more time for discovery. We find neither sufficient evidence nor an abuse of discretion and therefore AFFIRM the decision of the district court.

## I

In March of 1983, Solo Serve Corporation agreed to lease space in a shopping center from the owner of the center, John G. Amato. The lease ran for fifteen years, and gave Solo Serve the option to extend the lease for two additional five year periods. As is typical of such leases, both Solo Serve and Amato made a number of promises intended to create an attractive and comfortable shopping atmosphere for the potential customers of the center.

In 1986, Amato sold the center to Westowne Associates, a limited partnership. In June of 1988, Solo Serve discovered that Westowne planned to lease the space in the center that had previously been occupied by Westside Theaters to Jefferson Downs, Inc. d/b/a The Finish Line ("The Finish Line"). The Finish Line planned to operate an off-track betting business in the leased space. Solo Serve notified Westowne that Solo Serve would consider such action by Westowne a breach of the terms of the lease between Solo Serve and Westowne.

Despite this notice, Westowne leased the space to The Finish Line. The Finish Line opened as an off-track betting business in October of 1988. In December of 1988, Solo Serve filed this action [1] seeking a declaration that Westowne had breached the terms of the lease between Solo Serve and Westowne. It requested a permanent injunction against the operation of an off-track betting business in the shopping cen-

---

1. Solo Serve sued both Westowne and The Finish Line. The district court held that the terms of the lease between Solo Serve and Westowne did not bind The Finish Line, and dismissed the action against The Finish Line. Solo Serve does not appeal this aspect of the decision.

ter, or, in the alternative, the cost of relocating its store to a shopping center without such a business.

In its complaint, Solo Serve alleged that Westowne had breached four terms of the lease agreement by leasing space in the center to an off-track betting business. First, Solo Serve alleged that Westowne had breached the covenant of quiet enjoyment provided by paragraph 37 of the lease. Second, it alleged a breach of paragraph 39 of the lease which provides:

Neither LANDLORD nor TENANT shall engage in or permit waste or any other activity at or around the Demised Premises which violates any applicable law, ordinance or regulation related to the Demised Premises, constitutes a nuisance, produces loud noises or unpleasant odors, is likely to bring discredit upon the Shopping Center, or discourage customers from patronizing other occupants of the Shopping Center by other than activities customarily engaged in by reputable businesses.

Third, it alleged breaches of two provisions in paragraph 40 of the lease which provides:

A. LANDLORD agrees that it will not re-lease the premises in the Shopping Center ... currently occupied by Westside Theaters ... to any tenant whose business activity customarily requires more than 5½ parking spaces per 1000 square feet of building area.

. . . .

C. LANDLORD will not lease, rent, occupy, or permit to be occupied or used without TENANT's prior written consent any part of the Shopping Center for the operation of a pornographic bookstore or any portion of the Shopping Center within one hundred (100') feet of the Demised Premises for the operation of nightclubs or bars.

On September 29, 1989, Westowne filed a motion requesting summary judgment. Westowne also filed several affidavits that established:

(1) A new parking lot had been built adjacent to The Finish Line. Most of the customers of The Finish Line used this new parking area, and, as a result, customers of The Finish Line customarily used less than 73 spaces in the original parking lot, which was adjacent to Solo Serve.

(2) The Finish Line had a license to sell food and alcohol and did so. The gross income from food and beverage [2] concessions was only 2.5 percent of the gross income from betting.[3]

Solo Serve filed an opposition on October 10, 1989. No affidavits or depositions were filed with the opposition. Instead, Solo Serve argued three things: (1) the evidence presented by Westowne created a genuine issue of fact as to whether The Finish Line was a bar; (2) The Finish Line had not complied with the discovery orders of the court, limiting Solo Serve's ability to respond to the income figures given in the affidavit; and (3) the relevant statistic was not the percentage of gross income, but the percentage of net income, derived from the sale of alcohol.

On October 12, 1989, Westowne filed a supplemental memorandum in support of its motion. Westowne attached another affidavit stating that the net income from the sale of food and beverages constituted only 14 percent of the net income of The Finish Line from October of 1988 through July of 1989. The district court heard oral argument on the motion on October 18, 1989, and denied the motion for summary judgment.

On November 6, 1989, Westowne filed a motion asking the district court to reconsider Westowne's motion for summary judgment. An attached affidavit stated that the net income from the food and beverage concession between January 1, 1989 and September 7, 1989 constituted less than 7 percent of the total net income of the betting business. On November 7th, Solo Serve again filed an opposition containing

2. The Finish Line made available to its patrons both alcoholic and non-alcoholic beverages.

3. The Finish Line presented no figures apportioning the sales among food, alcoholic beverages, and non-alcoholic beverages.

arguments, but no evidentiary facts. First, it argued that the evidence introduced by Westowne established that the sales of alcohol at The Finish Line were substantial, and therefore violated the lease even if The Finish Line earned most of its income from betting. Second, it argued that, while The Finish Line had provided its net income in the form of a bottom line number, it had failed to produce the supporting data as required by the discovery order of the court.

On November 15th, Westowne filed further affidavits that provided some detail of the income and the expenses of The Finish Line.[4]

The district court took the matter under submission and granted the motion on January 11, 1990. The district court relied on *Piggly Wiggly v. Wolpert Associates*[5] in finding that the betting parlor was not a bar because only 6.5 percent of its net income came from the food and beverage concession. The district court also read the parking space limitation as an intention by the parties to limit the number of spaces that the new tenant would customarily use in the original parking lot, rather than a prohibition on stores that required excessive parking space *per se*. Given the size of the area leased by The Finish Line,[6] the court interpreted the lease to limit to seventy-three the number of parking spaces that could be used customarily by the patrons of The Finish Line *in the original parking lot*. The only relevant evidence presented established that, because of the construction of the additional parking area immediately adjacent to The Finish Line, fewer than seventy-three of the original parking spaces were customarily used by the patrons of The Finish Line. Thus, despite the fact that customers of The Finish Line may have ordinarily required more than 5½ spaces per 1000 square feet of building space, the district court held that the provision was not violated.

The district court did not explicitly consider the "bring discredit upon" or the "reputable business" language of paragraph 39 of the lease, or the covenant of quiet enjoyment provided by paragraph 37. Apparently, the district court reasoned that, because Louisiana law permits a restrictive covenant to reach and prohibit only those uses clearly delineated in the covenant, the terms in paragraph 39 were too vague to be enforceable against an otherwise lawful business.

Solo Serve raises three arguments on appeal. First, Solo Serve argues that the affidavits presented by Westowne create a genuine issue of fact as to whether The Finish Line was a "nightclub[ ] or bar[ ]" because a reasonable jury could draw the inference, from The Finish Line affidavits, that The Finish Line is a bar. Second, Solo Serve argues that the district court abused its discretion in failing to give Solo Serve more time for discovery. Third, Solo Serve

4. The breakdown helps to explain why the 14 percent of net income figure sworn to in the October 12th affidavits had dropped to below 7 percent by the time of the November affidavits. The breakdown contained data both for a "Current Month" and "Current Year". According to the allocation of income and costs made by The Finish Line in its breakdown for the "Current Month", The Finish Line had lost over $13,000 on its food and beverage concessions in the "Current Month". Such nifty accounting makes it readily apparent why Solo Serve sought the underlying data rather than the bottom line figures. If the concession was in fact losing so much money, The Finish Line would have ceased to operate it. The reason it had not is because the concession was an integral part of the atmosphere of the betting business. While the concession might appear to lose money under the method of accounting used by The Finish Line in dividing its income for use in this litigation, The Finish Line knows that the concession keeps people comfortable and happy while they lose their money on horses. One can almost imagine the casinos in Las Vegas arguing that they are not bars because the drinks are complimentary for gamblers. To determine the true income derived from the concession would require comparing the net income of a betting business with such a concession to the net income of an identical business without such a concession. Neither party has presented such evidence.

5. 519 So.2d 371 (La.Ct.App.), *writ denied*, 522 So.2d 1098 (La.1988).

6. The Finish Line leased a space of 13,425 square feet. Given 5 and ½ parking spaces per 1000 square feet, The Finish Line would be entitled to roughly 73 parking spaces in the original parking lot.

argues that the district court erred in granting summary judgment on the issue of whether Westowne had breached the parking lot, the "bring discredit upon", and the quiet enjoyment covenants.

## II

We review the district court's grant of summary judgment as an issue of law: the question is whether sufficient evidence was presented to enable a reasonable jury to find for Solo Serve.[7] Because Westowne made the motion, we must view the evidence in the light most favorable to Solo Serve and draw all *reasonable* inferences in favor of Solo Serve.[8] Because Solo Serve is the plaintiff, Solo Serve has the burden of ensuring that the evidence presented is sufficient to establish a *genuine issue* of material fact.[9] While Solo Serve may use the affidavits filed by Westowne to satisfy this burden, only evidence—not argument, not facts in the complaint—will satisfy Solo Serve's burden.

For each provision, we follow the same analysis that was used by the district court. We determine the meaning of the provision, and then look to see if there is sufficient evidence for a reasonable jury to determine that the provision was breached.[10]

Both the parties and the district court assume that the relevant provisions are "restrictive covenants". Under Louisiana law, restrictive covenants are construed strictly and reach only those uses of the property that are clearly delineated in the covenant.[11]

We disagree that these four provisions are "restrictive covenants". The general rule in Louisiana is that leases are contracts, to be interpreted according to the customary principles of contract interpretation.[12] The Louisiana courts have carved an exception to this general rule for "restrictive covenants"—covenants that public policy requires be given a narrow scope. Louisiana courts have not applied the exception to every lease provision that constrains in some way the landowner's use of its property. After all, a lease itself limits the landowner's use of his property, by preventing the landowner from either re-leasing the property to another or using the property himself. Despite this apparent constraint on the "free use of land", Louisiana courts have never concluded that every lease must be construed strictly against the tenant.

In the context of a shopping center lease, the Louisiana courts have construed a term strictly under the restrictive covenant analysis only when the term excludes a direct competitor of the original tenant from the shopping center, or geographic vicinity of the first tenant.[13] For example, in *Piggly Wiggly*, Piggly Wiggly leased space in a shopping center to open a grocery store. As part of its lease, it required a provision in which the landlord promised

---

7. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

8. *See, e.g., Lavespere v. Niagara Mach. & Tool Works,* 910 F.2d 167, 177–78 (5th Cir.1990).

9. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Teply v. Mobil Oil Corp.,* 859 F.2d 375, 379 (5th Cir.1988).

10. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510; *Lavespere,* 910 F.2d at 177.

11. *See Diefenthal v. Longue Vue Management Corp.,* 561 So.2d 44, 51 (La.1990); *Piggly Wiggly,* 519 So.2d at 372.

12. *See, e.g., Thomas v. Knight,* 457 So.2d 1207, 1209 (La.Ct.App.1984); *Aguillard's Enters. Inc. v.*

*Smith,* 439 So.2d 1158, 1160 (La.Ct.App.1983), *writ denied,* 444 So.2d 1224 (La.1984).

13. Because of fears that a covenant created long ago under far different circumstances may limit a current use of the property, Louisiana courts have also construed limitations on land use strictly to promote the free use of land. *See, e.g., Clark v. Manuel,* 463 So.2d 1276, 1279 (La. 1985). The Louisiana courts have not applied this analysis to the shopping center lease context, and justifiably so. Both the landlord and the tenant in these situations will invest considerable sums to make the center attractive to customers. Both agreed to the division of investments and returns specified in the lease. If the lease turns out to be somewhat less profitable for the landlord than the landlord had originally hoped, that is no reason to permit the landlord to change his mind about the use to which he wants to put his property.

to "prohibit any other tenant on said property from selling grocery, meats, dairy, deli or bakery products and produce." [14]  Similarly, in *Leonard v. Lavigne*,[15] the tenant leased land to operate a service station.  In the lease, the tenant required a term in which the landlord agreed not to lease any of the surrounding property to a competitive business.[16]

In both cases, the tenant required a term in the lease that would exclude a competitor from the immediate geographic vicinity of the tenant.  In both cases, the courts suggested that the covenants would be construed strictly.  In both cases, public policy concerns about the potential anticompetitive effect of such covenants justified a strict construction limiting the scope of such anti-competitor covenants.

The facts in this case are far different.  Solo Serve is not an off-track betting business, nor is it a bar; rather, it is a department store.  The terms in question are not designed to prevent a competitor of Solo Serve from leasing space in the shopping center.  They are designed to make the shopping environment more attractive to potential consumers, and the terms reflect the parties' agreement as to how to go about making the shopping environment more attractive.  Both parties agree to do certain things, and both agree not to do others.  Both types of the promises are essential to the parties' bargain, and we can see no reason to interpret the two types of promises differently in this case.

But even giving a fair, rather than strict, construction to the four terms, we must agree with the district court that Solo Serve has failed to satisfy its burden.  The only evidence presented, the affidavits filed by The Finish Line, does not provide a sufficient basis for a reasonable jury to conclude that any one of the four provisions has been breached by Westowne.

## A.  *Covenant of Quiet Enjoyment*

■ In arguing that Westowne breached the covenant of quiet enjoyment, Solo Serve points to certain facts in its complaint concerning the crowds and noise from The Finish Line and argues that these facts are sufficient to establish constructive denial of peaceful possession.  We must reject Solo Serve's argument.  Given that Westowne has filed a properly supported motion for summary judgment, Solo Serve cannot rely on the facts in its unverified complaint, but must point to evidence in the record [17] sufficient to establish the alleged facts to avoid summary judgment.[18]  Given Solo Serve's failure to point to such evidence, the district court properly granted summary judgment with regard to the alleged breach of the covenant of quiet enjoyment.

## B.  *"Bring Discredit Upon"*

■ Solo Serve argues that the questionable moral character of gambling provides a sufficient basis for a reasonable jury to infer that, by leasing space to an off-track betting business, Westowne has brought discredit upon the center.  Westowne counters that a legal business must necessarily be a reputable business, and that a legal business cannot bring discredit on the center.  While we disagree with Westowne that the parties intended these words to reach only illegal activities,[19] we cannot agree with Solo Serve that general knowledge concerning the questionable moral character of gambling provides a sufficient evidentiary basis to support a finding that the Westowne has breached this provision.

14.  519 So.2d at 372.

15.  245 La. 1004, 162 So.2d 341 (1964).

16.  162 So.2d at 342.

17.  Such evidence may take the form of affidavits, filed depositions, filed answers to interrogatories, or filed admissions.  Fed.R.Civ.P. 56(c).

18.  *See Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553.

19.  Other language in the same clause addresses illegal activities.  Adopting the interpretation proposed by Westowne would make the "bring discredit upon" and the disreputable activities language superfluous.  This we will not do.  La. Civ.Code Ann. art. 1951 (West 1977).

Given the various provisions in the lease attempting to create an attractive shopping environment, we interpret the "bring discredit upon" and the disreputable business language, in context,[20] to refer to those activities of such questionable moral character that they make the center less attractive to potential customers. We cannot reasonably interpret the provision to reach all activities that some segment of the community might find morally questionable but only those activities whose moral character will drive potential customers elsewhere.

For a reasonable jury to conclude that Westowne has breached this provision would require something more than the general knowledge that a segment of the community questions the moral character of gambling. Given the context of the provision, Solo Serve would need to provide some evidence that potential customers will find the center less attractive because of the proximity of the gambling business. Solo Serve could have presented circumstantial evidence of such impact, by showing a decline in its sales or a decline in the number of customers since the arrival of The Finish Line. It could have presented direct evidence through the testimony or affidavits of potential customers who shopped elsewhere because of their moral outrage over the location of The Finish Line. But Solo Serve presented neither. Because of that failure, we must affirm the finding of the district court that there was insufficient evidence to make the question of whether Westowne had breached the second lease provision a genuine issue of fact.

### C. *Parking Spaces*

■ In the third relevant provision, Westowne agreed not to lease the space occupied by Westside Theaters to a new tenant whose business activity "customarily requires more than 5½ parking spaces per 1000 square feet of building area." The

district court did not adopt a literal interpretation of this provision. Instead, the district court recognized that the purpose of the provision was to ensure adequate parking for Solo Serve's customers. We find the district court's interpretation to be entirely proper.[21] Solo Serve has advanced no reason why the clause should be interpreted literally, when the construction of additional parking can solve the underlying concern. Thus, we interpret the second provision to prohibit the customary use of more than seventy-three parking spaces in the original parking lot by the patrons of The Finish Line.

Given our interpretation of the provision, we find insufficient evidence to enable a reasonable jury to conclude that Westowne has breached the provision. The only evidence presented on the issue stated that fewer than seventy-three parking spaces were customarily used in the original parking lot by the patrons of The Finish Line. Given the lack of any contrary evidence, we must affirm the grant of summary judgment on this issue.

### D. *No Bars*

■ In the fourth provision, Westowne agreed to obtain written consent from Solo Serve before leasing space anywhere in the center to a pornographic bookstore, and before leasing space within one hundred feet of Solo Serve to a bar or nightclub. The words "bar", "nightclub", and "pornographic bookstore", must be given their "common and usual significance".[22] The parties agree that if the provision applies, it is because The Finish Line is a bar, as that term is usually understood.

In determining whether The Finish Line is a bar, we can imagine any number of comparisons that would be relevant to the factual determination of whether The Finish Line would come within the customary meaning of "bar".[23] The only evidence

20. La.Civ.Code Ann. arts. 1950 & 1955 (West 1977).

21. La.Civ.Code Ann. art. 1950 (West 1977).

22. La.Civ.Code Ann. art. 1946 (West 1977).

23. When they signed the lease, the parties used the term "bar" to describe a certain type of place—one whose average customer was not interested in shopping in the rest of the center, and one whose atmosphere and influence on the surrounding area would diminish the attractive-

presented, though, concerns the amount of sales made in the food and beverage concession, as an absolute number and as a percentage of gross and net income. While this evidence provides a basis for a reasonable jury to infer that The Finish Line sells a substantial amount of alcohol,[24] and that the sale of alcohol is an integral part of its operations, businesses other than bars, such as restaurants, also sell alcohol as an integral part of their operations. On its own, we do not find the evidence that alcohol sales may constitute up to 14 percent of the net income of The Finish Line sufficient to permit a reasonable jury to infer that The Finish Line is a bar.

Given the evidence presented, we agree with the district court that Solo Serve has not created a genuine issue as to whether Westowne's actions breached the lease. Solo Serve argues, as its second point, that the district court abused its discretion in failing to allow Solo Serve more time for discovery.

## III

■ In response to each of Westowne's motions for summary judgment, Solo Serve argued that The Finish Line had failed to comply with the discovery orders of the court concerning the breakdown of the expenses and income of The Finish Line. According to the record, this breakdown was provided to Solo Serve on November 15th. While Solo Serve has, in this appeal, raised a number of other aspects of discovery that had not been completed, the only aspect raised before the district court, in an affidavit or otherwise, was the objection that The Finish Line had not complied with the discovery orders concerning its income.

Because a party must present certain specific facts in order to obtain a Rule 56(f) continuance,[25] we will not consider on appeal reasons for such a continuance that a party failed to present to the district court. We review the district court's decision to grant summary judgment despite this allegedly incomplete aspect of discovery for an abuse of discretion.[26]

We note first that The Finish Line had provided a fairly detailed breakdown of its income and expenses, even if it had not produced the original invoices that had been requested by Solo Serve. It is unclear whether further detail would have been of any assistance. The figures provided were more than adequate as a basis for an expert in the area to express an opinion concerning the true importance of the sale of alcohol to the operations of The Finish Line. Second, we do not understand how the failure to provide detailed income figures limited the ability of Solo Serve to provide other evidence that might establish that the gambling operation fell within the customary usage of "bar". Solo Serve provided no evidence concerning the atmosphere and clientele of The Finish Line.

Given the limited relevance of further detail on the income and expenses of The Finish Line, and the ready availability of other evidence, we cannot conclude that the district court abused its discretion by refusing to provide more time for discovery.

## IV

While the facts detailed in the pleadings suggest that Westowne may have violated the terms of its lease with Solo Serve, we must AFFIRM the grant of summary judg-

---

ness of the shopping center. Solo Serve was free to present evidence that the atmosphere, clientele, and influence of The Finish Line were such that the gambling business was a bar within the meaning of the lease. But Solo Serve presented no such evidence.

**24.** Given that The Finish Line had sole possession of the income data and did not differentiate between the various aspects of the concession, a reasonable jury could infer that The Finish Line failed to differentiate between food, alcoholic beverage, and non-alcoholic beverage sales specifically because the sale of alcoholic

beverages generated the vast majority of the concession income.

**25.** To obtain a continuance, a party must specifically explain both why it is currently unable to present evidence creating a genuine issue of material fact and how a continuance would enable the party to present such evidence. *See, e.g., Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir.1990).

**26.** *See, e.g., Carriere v. Sears, Roebuck & Co.,* 893 F.2d 98, 102 (5th Cir.1990).

ment in favor of Westowne because of the complete failure of Solo Serve to ensure that sufficient evidence was presented at the time of Westowne's summary judgment motion to create a genuine issue of material fact.