Jimmie BELGARD, et ux

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE, et al.

Civil Action No. 00–2664.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Dec. 17, 2001.

Paul A Lemke, III, Harrisonburg, LA, for plaintiffs.

Robert A Thrall, U.S. Atty's Office, Shreveport, LA, for defendants.

## MEMORANDUM RULING

LITTLE, Chief Judge.

Before this court is a Motion for Summary Judgment [Doc. No. 17] filed by defendant, United States of America (the "United States") for the United States Department of Agriculture (the "USDA"), Willie Cooper ("Cooper"), Craig McCain ("McCain"), and Robert Bradley ("Bradley"), against plaintiffs Jimmie Belgard and Trudie Belgard (the "Belgards"). The United States relies on Rule 56 of the Federal Rules of Civil Procedure ("FRCP") for relief. Plaintiffs filed an opposition to this motion. For the following reasons, we GRANT this motion.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Because the essence of this case implicates certain provisions of the Administrative Procedures Act (the "APA"), we begin with a review of the genesis of the Belgards' APA claim, including the events that triggered this court's authority to review a decision of the USDA.

1. *The Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriation Act of 1999*

In 1998, the Belgards engaged in aquaculture farming and harvesting of catfish fingerlings in the Parish of Rapides, State of Louisiana.[1] While the catfish fingerling industry has progressed due to improvements in technology, not all fish successfully mature to harvest. That is, a certain percentage of catfish fingerlings will normally perish during an aquaculture grow-

---

1. "Aquaculture" is defined as follows: "the reproduction and rearing of aquatic species in controlled or selected environments..." 7 C.F.R. § 1477.103 (1999).

ing season. [4] Conversely, other loss of fish occur because of natural disasters, such as excessive heat or drought. Financially to assist producers, including catfish producers, who suffered crop losses due to natural disasters in 1998, or in at least three (3) of the four (4) years between 1994 and 1998, Congress passed the Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriation Act of 1999, §§ 1101 and 1102 (Pub.L. 105–277, 112 Stat. 2681–42 through 2681–44) (the "Act"). Sections 1101 and 1102 of the Act created the Crop Loss Disaster Assistance Program (the "CLDAP"). *See* 7 C.F.R. § 1477.101 et seq. (1999). Furthermore, Congress designated the USDA as the federal agency charged with the task of administering the provisions of the CLDAP.

Under the CLDAP, Congress authorized financial relief for producers to be appropriate only for losses directly resulting from a natural disaster. *See* 7 C.F.R. §§ 1477.104(a), 1477.201(b)(3) (1999). Under the CLDAP, the Secretary of the USDA had the responsibility of formulating a method to calculate disaster payments to eligible catfish fingerling producers. *See* 7 C.F.R. § 1477.101(a) (1999). Recognizing, however, that not all losses are the result of natural disasters, Congress required the USDA to identify and quantify losses due to events or conditions other than disasters, which would be applied equally to all aquaculture farm producers. *See* 7 C.F.R. § 1477.110(e)(2). In order to quantify losses due to occurrences other than natural disasters, the USDA created the following definition term: "Normal mortality." *See* 7 C.F.R. § 1477.103 (1999). Normal mortality is defined as follows: "the percentage of . . . dead aquacultural species that would normally occur during the crop year." 7 C.F.R. § 1477.103 (1999). Also, the CLDAP specified that the provisions of the

program "shall be carried out in the field by State and county Farm Serve Agency committees." 7 C.F.R. § 1477.102(a). As a result, the USDA and Louisiana State Office of the Farm Service Agency (the "FSA") began the process of formulating a normal mortality rate for the State of Louisiana's (the "State") catfish fingerling industry.

Robert Bradley, an FSA program specialist, proved instrumental in arriving at the baseline, normal mortality rate. Namely, Bradley assisted in the preparation of a document that established the normal mortality rate: the Louisiana Disaster Assistance Program DAP–20 ("DAP–20"). In formulating the normal mortality rate, Bradley sought and received assistance from the following agencies: (1) the Louisiana State University Agricultural Center ("LSU"); (2) County Executive Directors of the FSA; and (3) catfish producers in the State. Specifically, between January and March 1999, Bradley conferred numerous times with Dr. C. Greg Lutz ("Lutz"), an aquaculture specialist at LSU. Lutz admits that, although he did not specifically recommend applying a normal mortality rate of 20%, he "provided the figure of 20% mortality as a typical rate for the Louisiana [catfish fingerling] industry during the 1998 time frame covered by the [CLDAP]" to Bradley. In addition to relying on Lutz's expert opinion, Bradley interviewed numerous catfish producers, they confirmed that a normal mortality factor of 20% to be consistent with their experience in the catfish fingerling industry. Finally, Bradley considered technical reports on the subject of the aquaculture, catfish fingerling industry when arriving at the recommendation to employ a normal mortality rate of 20%. As a result, on 26 March 1999, the USDA, with the assistance of and through the FSA, adopted and included in Louisiana

Disaster Assistance Program Notice–20 ("DAP 20") a normal mortality factor of 20% for the State's catfish fingerling industry. The normal mortality factor of 20% meant that when a catfish producer applied for financial assistance under the CLDAP, the USDA would apply a 20% normal mortality factor to any disaster assistance awarded an applicant under the CLDAP.

### B. *The Belgards Application for Disaster Assistance Under the CLDAP*

As previously stated, in 1998, the Belgards owned and farmed six (6), aquaculture, catfish fingerling ponds. During the summer months of 1998, the Belgards contend that they suffered severe losses, amounting to 59.87% of their catfish fingerlings, due to disaster; namely, extremely hot weather. As a result, on or about 8 April 1999, the Belgards applied to the FSA County Committee (the "CC") for financial assistance pursuant to the CLDAP. On 23 June 1999, the CC authorized payment to the Belgards in the amount of $44,255.82. The CC, however, did not compensate the Belgards for the loss of the entire crop, but instead applied the 20% normal mortality factor to the loss calculation, which resulted in the plaintiff's receiving less financial assistance than plaintiffs deemed appropriate.

Unsatisfied with the amount of disaster assistance awarded, the Belgards initiated the process of appealing the amount of the relief granted by the CC. Specifically, the Belgards appealed the CC's use and the USDA's adoption of the 20% normal mortality factor when calculating the monetary amount of the Belgard's disaster relief. On 12 July 1999, plaintiffs requested the CC to reconsider its application of the 20% normal mortality rate when calculating disaster payment due the Belgards. On 16 September 1999, after reviewing plaintiffs' request, the CC notified the Belgards, in writing, that the use of the 20% normal mortality rate did not constitute an appealable issue. Thereafter, on 5 October 1999, plaintiffs requested the National Appeals Division (the "NAD") of the USDA to review the CC's written decision that the use of the 20% normal mortality factor did not amount to an appealable issue.

The NAD acknowledged the Belgard's written request on 6 October 1999 and requested that plaintiffs provide a written statement explaining why the CC's decision to use a normal mortality factor of 20% amounted to an appealable issue. In their letter to the NAD, the Belgards proffered two (2) reasons: (1) "an expected yield loss is a normal mortality and value loss crops do not lend themselves to normal mortality loss situations;" and (2) a normal mortality rate should not have been applied to calculate plaintiff's disaster payment because the "[normal mortality rate] is not a statutory or regulatory provision."

Subsequent to receiving the Belgards' written explanation, the NAD submitted the authored exposition to the FSA for study. Thereafter, on 19 October 1999, the FSA studied plaintiff's rationales, but contended that the normal mortality rate constituted a matter of general applicability and, therefore, did not amount to an appealable issue. The FSA then submitted its findings to the NAD. Likewise, in a written decision on 7 December 1999, the NAD determined that usage of the 20% normal mortality rate did not amount to an appealable decision. Additionally, the NAD denied the Belgard's request to reconsider this decision.

On 6 December 2000, pursuant to 5 U.S.C. § 702 of the APA and 7 U.S.C. § 6999, which provides for judicial review of final decisions rendered by the NAD of the USDA, plaintiffs filed a petition for

judicial review of the USDA's decision with this court. Additionally, the Belgards alleged the following additional causes of action: (1) USDA agents Cooper, McCain, and Bradley conspired to destroy plaintiffs' catfish fingerling business; (2) Cooper made false and misleading statements concerning the Belgards; and (3) the USDA reduced the Belgards' disaster benefits without an opportunity to be heard. Afterwards, on 9 September 2001, the United States filed its opposed motion for summary judgment, which this court now addresses.

## II. LAW AND ANALYSIS

### A. Standard of Review Under FRCP 56

The defendant seeks relief pursuant to Rule 56 of the FRCP. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999).

In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the non-moving party must come forward, after adequate time for discovery, with "specific facts" showing a genuine factual issue for trial. *See* Fed. R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Such evidence should create more than a metaphysical doubt about the material facts or should be more than a theoretical possibility that the claim is good. *See id.*; *Pennington v. Vistron Corp.*, 876 F.2d 414, 426 (5th Cir.1989); *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1123 (5th Cir.1988). The moving party need only point out the absence of evidence supporting the nonmoving party's case, it "need not negate the elements of the nonmovant's case." *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). Allegations in the pleadings, naked assertions of factual disputes, and conclusory allegations are not sufficient. *See Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 165 (5th Cir.1991); *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir.1989); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir.1986).

While the party opposing the motion may use proof filed by the movant to satisfy his burden, "only evidence—not argument, not facts in the complaint—will satisfy" the burden. *See Solo Serve Corp.* 929 F.2d at 164. "Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *See Larry v. White*, 929 F.2d 206, 211 n. 12 (5th Cir.1991), *cert. denied*, 507 U.S. 1051, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

In addition to the standard of review required by Rule 56 of the FRCP, we are required to apply a standard of review that is specific to this court's review of administrative agency decisions.

### B. Standard of Review under the APA

■ The standard of review for judicial review of decisions made by administrative agencies is one of great deference and does not include a *de novo* review of the facts. *See Brouillette v. U.S. Dep't of Agric.,* 840 F.Supp. 55, 57 (W.D.La.1993). Reversal of an agency decision is appropriate only upon a finding that the administrative action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Bank of Commerce v. City Nat'l Bank,* 484 F.2d 284, 289 (5th Cir.1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974). A court is not permitted to impose its own construction of a statutory provision for a reasonable interpretation made by the agency. *United States v. Shimer,* 367 U.S. 374, 382–83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). It is well established that "judges review administrative action on the basis of the agency's stated rationale and findings." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,* 751 F.2d 1287, 1325 (D.C.Cir.1984), cert. denied, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). The agency must articulate the reasons why it has exercised its discretion in a given manner. *T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). A decision is arbitrary or capricious "only when it is 'so implausible that it could not be ascribed to a difference in view or the product or the product of agency expertise.'" *Wilson v. U.S. Dep't of Agric.,* 991 F.2d 1211, 1215 (5th Cir. 1993). The job of the reviewing court, therefore, is only to determine whether the administrative findings are supported by substantial evidence of the record as a whole. *Bank of Commerce,* 484 F.2d at 289.

■ In determining whether the agency's construction is reasonable, the court confines its inquiry to the evidence before the agency, that is, the statements in the record of the decision-making process. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43–44, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). While the focal point of review is the administrative record, however, the court may rely upon the additional explanations of agency decision-makers obtained through affidavits, where the agency's rationale cannot be fully discerned for effective judicial review. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

■ Further, when determining if an agency's construction of a regulation is legally permissible, the analysis is governed by the Supreme Court's decision in *Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Pursuant to this framework, the reviewing court asks two (2) questions. *See id.* at 842, 104 S.Ct. at 2781–82. First, "is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. If the first question is answered in the negative, then "the question for the. court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2781–82. Moreover, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate

a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. at 2782–83. The agency's interpretation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2778. Furthermore, the interpretation should be upheld if reasonable, and it is not necessary that the agency's interpretation be the sole interpretation or one that the court would reach if it were considering the matter initially. *Enron Oil and Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992) (citation omitted), *cert. denied*, 510 U.S. 813, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993).

1. *The Belgard's Claim That the USDA Acted Arbitrarily or Capriciously in Adopting a 20% Normal Mortality Factor Under the APA*

■■■ Plaintiffs argue that the USDA's decision to employ 20% as the normal mortality rate of catfish fingerlings in the formulation of disaster assistance under the CLDAP is arbitrary and capricious, without substantial support in the record. Conversely, the United States responds that the USDA arrived at the 20% figure in a rational, methodical manner, which is substantially supported in the record. For the reasons that follow, we agree with the United States.

First, the CLDAP specifically provided for the USDA to make financial assistance available for losses directly related to disasters only; that is, payment made for losses due to causes other than a disaster would exceed the express authority granted under both the Act and federal regulations. *See* Section 1102(a) of the Act; 7 C.F.R. §§ 1477.104(a), 1477.201(b)(3). Persons administering the disaster relief program are prohibited from paying benefits for losses resulting from any cause other than a disaster. *See* 7 C.F.R.

§ 1477.102(b). Second, the CLDAP expressly recognized that a percentage of catfish fingerlings will not survive to harvest under normal, non-disaster conditions. *See* 7 C.F.R. §§ 1477.110(e)(2), 1477.103. And third, although the federal regulations are silent in terms of normal mortality as a precise percentage, the statute has left a "gap for the agency to fill." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–82. As stated earlier, under *Chevron*, when a statute is silent or ambiguous with respect to a specific issue, the court asks whether the agency's answer or determination is based on a permissible construction of the statute. *See id.* We find adequate support in the record that the USDA arrived at the 20% normal mortality rate in a reasoned fashion.

The evidence suggests that Bradley sought guidance from a number of sources when formulating the 20% figure. For example, plaintiffs admit that Lutz, while not specifically recommending the agency to employ 20% as a normal mortality rate, did advise Bradley that a 20% mortality rate was a typical rate of mortality for the Louisiana catfish fingerling industry during thee 1998 aquaculture season, which is within the time period plaintiffs sought disaster assistance. Bradley, however, did not rely solely on Lutz's expert opinion. Instead, the record indicates that Bradley considered a great deal of other information, including the practices of numerous catfish producers in the State, each of whom confirmed that a 20% normal mortality rate was reasonable. Bradley also researched other relevant, technical reports. Even if this court could reach a different conclusion than Bradley reached, the test of an arbitrary and capricious decision is whether the conclusion can be attributed to a plausible point of view or agency expertise based on the information considered. *See Wilson*, 991 F.2d at 1215. In the instant case, the record demon-

strates that the USDA's decision to employ a 20% normal mortality factor when formulating disaster assistance under the CLDAP is plausible and is the result of germane information that the USDA considered.

Additionally, the record demonstrates that the Belgards took advantage of the opportunity to appeal the County Committee's decision. The record pertaining to the local and state committee appeals, including the NAD, discloses that the committees not only listened to plaintiff, but also required the agency to justify its position and rationale in formulating the 20% normal mortality factor. Based on all the information they received, the local and state committees and the National Appeals Division all concluded that the USDA's use of a 20% normal mortality factor constituted a non-appealable issue. Our review of this determination reveals that ample evidence exists in the administrative record to support the finding that the agency arrived at the 20% normal mortality factor in a reasoned manner. Therefore, we find that the USDA's decision to employ a 20% normal mortality factor for catfish fingerlings in the 1998 season not to be so "implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Gibson v. United States*, 11 Cl.Ct. 6, 15 (1986) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866). In sum we are not persuaded that the USDA acted arbitrarily or capriciously when formulating and applying the 20% normal mortality factor. Accordingly, we grant defendant's motion for summary judgment with respect to Belgards' claim pursuant to the APA.

2. *The Belgards' Claims Against Cooper, McCain, and Bradley*

The Belgards' claim that Cooper, McCain, and Bradley (collectively the "Individual Defendants") conspired to destroy plaintiff's aquaculture business. Plaintiffs' claim of conspiracy does not merit extensive discussion. As already stated, Bradley is a program specialist with the FSA. Since 1991, McCain has served as FSA County executive director for Rapides Parish, and Cooper is the executive director of the FSA. Plainly, under 28 U.S.C. § 2679(b)(1), federal employees acting within the course and scope of employment, whether in a discretionary or operational role, are afforded absolute tort immunity. *Perry v. United States of America*, 936 F.Supp. 867, 872 (S.D.Ala. 1996) (citations omitted).

Under Section 1102(a) of the Act, Congress authorized the Secretary of the USDA to pay benefits to farmers for losses suffered as the result of disaster. *See also*, 7 C.F.R. § 1477.101. The Act afforded the USDA with wide discretion to "fill in the gaps" in order to define the parameters for attributing a loss to a disaster. The record indicates that the Individual Defendants acted within the scope of their employment in defining the parameters of the Act, including the formulation of the 20% normal mortality factor for catfish fingerlings. Cooper, McCain, and Bradley participated in the adoption of the 20% normal mortality rate and the application of same. As a result, this court finds it palpably pellucid that all the Individual Defendants acted within the scope of employment. The Individual Defendants, therefore, are shielded from the claim of conspiracy alleged by the Belgards.

The claim by the Belgards against Cooper for alleged false and misleading statements is likewise barred under 28 U.S.C. § 2679(b)(1). Cooper's alleged statements emanated through his position as a State executive director of FSA; therefore, Cooper uttered the statements within the course and scope of his employment.

Finally, Belgards also allege that the Individual Defendants reduced plaintiffs' benefits by applying the 20% normal mortality factor without notice to be heard. As we stated in detail above, the Act authorized the USDA to formulate a normal mortality factor, and the USDA did not act arbitrarily or capriciously during its decision-making process. Furthermore, the 20% mortality rate is an interpretive rule for which no notice or opportunity to be heard is required under the APA. *See* 5 U.S.C. § 553(b)(3)(A). Interpretive rules explain or define particular terms in a statute; they are statements as to what an agency thinks the statute means. *See Davidson v. Glickman,* 169 F.3d 996, 999 (5th Cir.1999) (quoting *Brown Express Inc., v. United States,* 607 F.2d 695, 700 (5th Cir.1979)). Furthermore, an interpretive rule is one "issued by an agency to advise the public of the agency's construction of a statute and rules which it administers." *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 1717–18 n. 31, 60 L.Ed.2d 208 (1979). As required by the CLDAP, USDA interpreted the meaning of "normal mortality" rate under non-disaster conditions. Therefore, the USDA interpreted the statute, which does not implicate any right or interest of the Belgards subject to notice and hearing requirements. As a result, we grant defendant's motion for summary judgment with regard to plaintiffs' claims against the Individual Defendants.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment under Federal Rule of Civil Procedure 56 is GRANTED.